```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/24/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------- X

WEI SU and HAI JUAN WANG,                                :
                                                         :
                Plaintiffs,                    :
                                                         :
                -against-                      :
                                                         :
SOTHEBY'S, INC.,                                         :
                                                         :
                Defendant.                     :
--------------------------------------------------------------------------- :

SOTHEBY'S, INC.,                                         :
                                                         :
                Counter-Claimant,              :
                                                         :
                -against-                      :
                                                         :
WEI SU, HAI JUAN WANG, and YEH YAO HWANG                 :
                                                         :
                Counterclaim-Defendants.       :          17-CV-4577 (VEC)
                                                         :
--------------------------------------------------------------------------- :          OPINION & ORDER

YEH YAO HWANG,                                           :
                                                         :
                Cross-Claimant,                :
                                                         :
                -against-                      :
                                                         :
WEI SU and HAI JUAN WANG,                                :
                                                         :
                Cross-Defendants.              :
--------------------------------------------------------------------------- :

WEI SU and HAI JUAN WANG,                                :
                                                         :
                Cross-Claimants,               :
                                                         :
                -against-                      :
                                                         :
YEH YAO HWANG,                                           :
                                                         :
                Cross-Defendant.               :
--------------------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

Wei Su ("Su"), Su's agent Hai Juan Wang ("Wang"), and Yeh Yao Hwang ("Yeh") dispute the ownership of the Zhou Zha Hu, an ancient Chinese ritual wine vessel (the "Vessel"), which was consigned by Wang to Sotheby's for auction.  After five years of protracted litigation, Yeh's cross-claim against Su and Wang for conversion is the only live claim remaining.  To resolve this dispute, the Court held a seven-day bench trial from June 6, 2022, to June 16, 2022.  For the reasons discussed below, the Court finds that Yeh has proved that Su and Wang converted his fifty percent ownership interest in the Vessel and that Su and Wang are equitably estopped from asserting a statute of limitations defense to his conversion claim.  Therefore, the Court finds in favor of Yeh on his conversion cross-claim.

Based on its observations of the witnesses, examination of the evidence, and the parties' briefing, the Court makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

The Vessel at issue is from the Middle Western Zhou Dynasty, around the tenth to ninth Century B.C., *see* Stip. Fact 1, Dkt. 226 at 4, and is of considerable historical and financial value. Yeh credibly testified that he purchased the Vessel in 2002 from Lin, the son of a well-known art collector, for $600,000 dollars.  Trial Tr. ("Tr.")[1] at 83a:9-10, 84a:20-21, 407:15–409:4, 414:6-8.[2]  In 2005, Yeh needed $1 million in seed money to build a music center in Guangzhou, China.

---

[1]      The trial transcripts are found at docket entries 255, 257, 259, 261, 263, 265, and 267.  The transcripts at docket entries 255 and 257 both start at page one.  To differentiate between the two transcripts, the Court has included an "a" when citing the transcript at docket entry 255, and a "b" when citing the transcript at docket entry 257.

[2]      In what can only be viewed as a pot-calling-the-kettle-black strategy, Su and Wang question whether, in fact, the purchase transaction occurred because of various unusual aspects of the transaction.  Specifically, they point to the fact that Yeh: (1) did not know Lin's first name despite knowing members of his family; (2) did not ask to see Lin's identity documents; (3) was able to arrange relatively easily for his bank to bring $600,000 dollars in

*Id.* at 490:8–491:6.  To that end, on May 31, 2005, Yeh met with Zhang Shenbao ("Zhang") and Szutu Chin Chiang ("Szutu") to arrange a $1 million loan from Zhang.[3]  *Id.* at 514:8-10.  At the meeting, Zhang agreed to lend Yeh $1 million at an eighty percent interest rate, and Yeh agreed he would pay Zhang $1.8 million following a successful auction of the Vessel by the Chongyuan Art Auction Company ("Chongyuan").  *Id.* at 91a:24–92a:9, 99a:24–100a:9, 297:24–298:5, 497:23–498:5, 514:8-12.  In the end, Zhang lent Yeh only $200,000, at the same eighty percent interest rate.  *Id.* at 107a:11-23.  Yeh agreed to repay Zhang the $200,000 loan plus $160,000 in interest, either following a successful auction of the Vessel, or if the auction failed, then thirty-five days after the new year.  *Id.* at 107a:11-23, 522:5-11, 541:5-9, 553:5-9.  Yeh was involved in extensive negotiations with Chongyuan about the consignment of the Vessel for auction, including meeting and corresponding with Ji Chong Jian, a bronzeware expert who held a senior position at Chongyuan,[4] and with Wu Ji, Chongyuan's lawyer at the time.[5]  *Id.* at 91a:24–92a:9, 101a:22-24, 104a:23–105a:2, 106a:1-11, 108a:3-12, 111a:8-21, 117a:13-18, 247:1-10, 248:17-19, 259:25–260:15, 261:7-8, 262:18-20, 427:8-18.

---

cash to his home; and (4) did not receive a receipt or other documents from Lin following the purchase.  *See* Trial Tr. ("Tr.") at 433:10–435:25, 440:25–441:4, 537:4-17.  Although those aspects of the transaction may be unorthodox (by American standards the Court would say that the transaction, as described by Yeh, was highly unorthodox), they do not support the argument that the purchase did not occur.  Moreover, without any evidence about Taiwanese banking procedures or about normal business practices in the art world in Taiwan, the Court has no basis to find that the purchase was fraudulent or otherwise suspect.  That said, the seemingly unorthodox aspects of Yeh's purchase are on a par with the seemingly unorthodox aspects of Su's purchase.  *See infra* notes 7–11 and accompanying text.

[3]     Su testified that Szutu told him that he had never met Yeh and that he was not present at any meetings between Yeh and Zhang, Tr. at 741:9–742:2, but that testimony was inadmissible hearsay, *see id.* at 742:3-4.

[4]     The testimony of the witnesses was not consistent as to Ji Chong Jian's position at Chongyuan; he has been referred to as the president, *see* Tr. at 31a:19-22, the legal representative, *id.* at 220:14–221:12, and the general manager, *id.* at 248:20-22.  Regardless of his official title, the parties do not dispute that he held a senior position at Chongyuan.

[5]     The witnesses testified about three individuals, Ji Chong Jian, Ji Zhong Yue, and Wu Ji, all of whom were associated in some way with Chongyuan.  Because all three people have "Ji" in their names, to avoid confusion, the Court will refer to those three individuals by their full names in this Opinion.

The Chongyuan auction, which was held in January 2006 in Shanghai, failed to result in a sale.  *Id.* at 114a:19-20.  In February 2006, Yeh wrote to Ji Chong Jian to ask Chongyuan to return the Vessel to him.  *Id.* at 117a:2-6, 118a:9-12, 264:7-12.  Instead of returning the Vessel, Chongyuan presented Yeh with an agreement dated June 2, 2005, which stated that the Vessel must be returned to Zhang if the auction fails.  *Id.* at 117a:2-6, 118a:9-12, 264:7-12, 265:1-17, 269:4-11; *see also* Agreement, Pl. Ex. 3.  The agreement was purportedly signed by Yeh and Zhang and was stamped with the Chongyuan seal.  Agreement, Pl. Ex. 3.  Yeh claimed that the agreement was invalid because his signature was forged.  Tr. at 266:20.

Given the dispute, Chongyuan refused to return the Vessel to either Yeh or Zhang, and litigation ensued.[6]  After losing twice below, Yeh appealed to the Shanghai Higher People's Court.  *Id.* at 269:23–270:9; *see also* Yeh Decl., Pl. Ex. 80 ¶¶ 37–39.  On May 22, 2007, that court held that Yeh and Zhang were co-owners of the Vessel and that Zhang had the right to possess the Vessel (the "Shanghai Judgment").  *See* Shanghai Judgment, Pl. Ex. 4 at 12–13, 15–16.  Yeh testified that, although he disagreed with the result of the litigation, he ultimately accepted it.  Tr. at 542:20-24; *see also* Yeh Decl., Pl. Ex. 80 ¶ 40.

In June 2007, the month after the Shanghai Judgment was entered, Zhang, Szutu, and Su met to discuss Su's purchase of the Vessel from Zhang.  Tr. at 598:3-7.  Su and Szutu have a longstanding relationship: Su testified that he has known Szutu for almost thirty years and that

---

[6]      It is unclear who initiated the litigation.  Yeh initially testified that he filed the lawsuit.  *Id*. at 269:15-19.  After being confronted with the judgment of the Shanghai High People's Court, which refers to Yeh as the defendant in the original trial, *see* Shanghai Judgment, Pl. Ex. 4, at 1, Yeh testified that it was possible that Zhang initiated the lawsuit, *see Tr*. at 477:12-479:13.  The discrepancy may be explained by Yeh's earlier testimony in his sworn declaration, in which he stated that he "commenced a lawsuit on March 8, 2006, against Zhang in Shanghai Minhang District Court for full-ownership of the Vessel" but that "Zhang later countersued [Yeh, who] ultimately withdrew [his] suit in District Court and initiated suit in Shanghai Intermediate Court against Zhang."  Yeh Decl., Pl. Ex. 80 ¶ 37.  Because the question of who initially sued whom is not germane to Yeh's conversion claim, the Court declines to wade further into the issue.

Szutu is like his father.  *Id.* at 593:9, 603:13-16.  In July 2007, Su, Szutu, and Zhang met again to discuss the purchase of the Vessel.  *Id.* at 600:20-23.  Su testified that at the July meeting he signed without reading what he thought was a letter of intention, but what was actually a sales contract.[7]  *Id.* at 600:14-19, 601:15-19, 602:9-12, 603:8-16, 605:8–606:5; *see also* Sales Contract, Pl. Ex. 86.  In August 2007, Su traveled to Hong Kong to see the Vessel in person.[8]  Tr. at 620:21-22.  Su testified that it was only at this visit that he agreed to purchase the Vessel for 5 million RMB.[9]  *Id.* at 622:10-17.

On September 14, 2007, Su arranged for the transfer of 1 million RMB to Zhang from someone who owed him money.[10]  *Id.* at 635:11-13, 635:22–637:7.  Su also gave Zhang four checks, each for 1 million RMB, from the account of a friend.  *Id.* at 634:10-23.  On the same date, in Szutu's presence at a restaurant in Hong Kong, Zhang gave Su physical possession of the Vessel.[11]  *Id.* at 637:10-22, 638:19-20.  According to Su, each of the four checks Su gave to Zhang bounced.  *Id.* at 639:16-18.  Su testified, however, that he ultimately paid Zhang in full: he testified that between 2007 and 2010, he brought Zhang cash each month until the amount owed was fully paid.  *Id.* at 619:18–620:8, 641:21–642:12.  Su testified that he believed the transaction was complete under Chinese law in 2007, even though he did not pay the full purchase price

---

[7]     Su testified that he only learned that the document was a sales contract during his 2019 deposition as a part of this litigation.  Tr. at 615:9-22.

[8]     No evidence was presented to explain the transfer of the Vessel from Chongyuan in Shanghai to Hong Kong.

[9]     The Court takes judicial notice of the fact that in 2007, 5 million RMB was worth approximately $660,000 dollars.

[10]     The evidence at trial demonstrated that Su was not an art collector and was not knowledgeable regarding antiques like the Vessel.  *Id.* at 592:12, 592:19, 592:24–593:4.  The evidence further showed that Su is a loan shark. *Id.* at 587:17–591:19.

[11]     Su, in turn, entrusted the Vessel to Szutu, who stored it in his brother's home.  *Id.* at 635:5-21.

until 2010.  *Id.* at 640:4–641:15.  Yeh credibly testified that he did not give Zhang permission to sell his fifty percent ownership interest in the Vessel to Su or to anyone else.  *Id.* at 273:21–274:1, 275:21-23.

In 2011, Su gave Szutu power of attorney to sell the Vessel.  *Id.* at 654:21-24.  Szutu, in turn, consigned the Vessel to Chongyuan for auction.  *See id.* at 596:13-17; 2011 Chongyuan Consignment Agreement, Pl. Ex. 6.  The auction was held, but, as with the auction in 2006, it failed to produce a sale.  Tr. at 663:11–665:5, 681:11-24.[12]  Yeh credibly testified that he was unaware that the auction had taken place.  *Id.* at 341:19-23.[13]

In 2014, Su again tried to sell the Vessel at auction, this time through Sotheby's in New York.  Su again gave power of attorney to Szutu to auction the Vessel.  *See* Power of Attorney, Pl. Ex. 22.  Szutu, in turn, authorized Wang to handle the consignment to Sotheby's.  *See* Power of Attorney, Pl. Ex. 21.  In August 2014, Wang, as Su's agent, entered into a Consignment Agreement with Sotheby's to sell the Vessel at auction.  Stip. Fact 4, Dkt. 226 at 5.  In September 2014, having seen in a Chinese art magazine that the Vessel was to be auctioned at Sotheby's, Yeh contacted Sotheby's, claimed he was a co-owner of the Vessel, and demanded that Sotheby's remove the Vessel from auction.  Tr. at 299:21–300:9; Stip. Facts 5, 6, Dkt. 226 at 5.  Sotheby's informed Wang about Yeh's ownership claim, *see* Stip. Fact 7, Dkt 226 at 5, and withdrew the Vessel from auction pending determination of the Vessel's true owner, *see* Stip. Fact 9, Dkt 226 at 5.[14]

---

[12]    Su further testified that there were attempts to rig the auction: when a fake bidder tried to raise the hammer price, the real bidder "disappeared," causing the auction to fail.  *Id.* at 663:11–665:5.

[13]    Yeh testified that he only learned of the auction in 2019, when he attended Su's deposition as a part of this litigation.  *Id.* at 341:19-23.

[14]    The Vessel is currently being stored by Sotheby's for safekeeping pending the outcome of this litigation.

Throughout 2014 and 2015, Sotheby's repeatedly urged Su and Wang to communicate directly with Yeh to resolve the ownership dispute.  *See* Oct. 28, 2014 E-Mail, Pl. Ex. 61; Dec. 24, 2014 Letter, Pl. Ex. 35; Jan. 2, 2015 Letter, Pl. Ex. 37; Jan. 23, 2015 Letter, Pl. Ex. 38. Sotheby's also repeatedly requested authorization to share Wang's contact information, or that of Wu Ji, Wang's attorney in China, with Yeh.  *See* Feb. 25, 2015 Letter, Pl. Ex. 39; July 22, 2015 Letter, Pl. Ex. 40; Aug. 14, 2015 Letter, Pl. Ex. 42; *see also* Tr. at 68b:11-15; 89b:6-12, 110b:3-10; 111b:18–114b:7, 222:18-24 (Wang's testimony acknowledging that Sotheby's wanted to share her contact information with Yeh).

Despite Sotheby's repeated requests, Su and Wang refused to permit Sotheby's to share their names and contact information with Yeh.  Wang admitted that she refused to disclose that information or to allow Sotheby's to do so.  *See* Tr. at 41b:12-15, 69b:1-15, 93b:20-24, 114b:14-19, 228:16-18, 234:17–235:5, 240:10-14 (Wang's testimony that she did not allow her name or contact information to be disclosed and that she did not provide Su's name to Sotheby's); *see also* Aug. 11, 2014 Consignment Agreement, Pl. Ex. 51 at 8 (stating that Wang does not consent to her name being disclosed); Tr. at 189:1-7 (acknowledging that Wang checked a box on the Consignment Agreement indicating that she did not consent to Sotheby's disclosing her name); Sept. 11, 2014 Wang Email to Sotheby's, Pl. Ex. 57 (reminding Sotheby's to keep all supporting data and information confidential).[15]

---

[15]     Wang also testified, however, that she authorized her attorney in China, Wu Ji, to contact Yeh's attorney. *See id*. at 229:9-10 ("I asked Attorney Wu . . . to contact Mr. Yeh's attorney in Taiwan."); *see also id*. at 229:3-17, 238-3-6 (making similar claims).  The Court finds that portion of her testimony not to be credible.  As an initial matter, a letter sent by Wu Ji to Sotheby's on August 31, 2015, unequivocally states that Wang and Su refused to allow their identities and contact information to be disclosed to Yeh.  *See* Aug. 31, 2015 Letter, Pl. Ex. 48.

Additionally, the Court finds that Wang's testimony, including the portions about whether she permitted her identity to be disclosed, was so riddled with inconsistencies and obvious falsehoods to warrant rejecting all of her testimony.  *See, e.g*., Tr. at 30a:8-12 (claiming that she does not recall whether there were two men named Ji associated with Chongyuan, despite testifying about both men); *id*. at 25b:7–29b:25 (giving contradictory testimony about her conversation with Ji Chong Jian in June 2014); *id*. at 42b:3–44b:3 (giving contradictory testimony about

Additional evidence presented at trial confirmed that Wang and Su refused to allow their identities and contact information to be disclosed to Yeh.  Sotheby's repeatedly requested Wang and Su to permit it to share their contact information with Yeh; Sotheby's also expressed its frustration to both Yeh's counsel and Su and Wang's counsel about the lack of authorization for disclosure from Su and Wang.  *See* July 22, 2015 Sotheby's Letter to Yeh's Attorney, Pl. Ex. 41 ("We have repeatedly sought authorisation from the Consignor to disclose such details, but, as the date of this letter, the Consignor has yet to give us such authorisation."); Aug. 14, 2015 Sotheby's Letter to Wu Ji, Pl. Ex. 42 (referring to Su and Wang's "unreasonable behaviour to withhold any such consent for our disclosure of your or the Consignor's contact details" to Yeh's attorney and the "refusal to liaise directly" with Yeh's counsel).  Moreover, Yeh credibly testified that he never received Su and Wang's contact information from anyone.[16]  *See* Tr. at 306:22–307:11, 310:25–311:21, 387:9-14.[17]  In short, the Court finds that throughout 2014 and 2015, Su and Wang refused to allow their contact information to be shared with Yeh.

In 2015, at the same time that Su and Wang were refusing to disclose their contact information to Yeh and unquestionably were aware that Yeh had asserted an ownership interest in the Vessel, Su sued Zhang to quiet title to the Vessel.  That lawsuit was brought in the Henan

---

whether she told Ya Ying Tian that he would receive an introductory commission if the Sotheby's auction were successful); *id.* at 85b:9–86b:12 (testifying that she does not recall why Sotheby's would not return the Vessel, which is the subject of the entire lawsuit); *id.* at 194:17-20, 196:3-9 (giving contradictory answers about whether she intended to attend a meeting that had been scheduled for November 2014).

[16]      Su testified that he authorized his lawyer to share his name and contact information with Yeh or with Yeh's lawyer.  *See id.* at 710:6-24.  Given the overwhelming evidence cited in text that Wang and Su refused to disclose their contact information, including in letters by their lawyer to Sotheby's, *see, e.g.*, Aug. 31, 2015 Letter, Pl. Ex. 48, the Court finds that testimony from Su not to be credible.

[17]      In contrast to Su and Wang's testimony on this point, Yeh's testimony is corroborated by an agreement he signed on May 9, 2016, in which he authorized Ren Jiang Wang to try and resolve his dispute with Zhang regarding the Vessel.  *See* Agreement, Def. Ex. 8.  If Yeh had been aware that Su and Wang were the parties seeking to auction the Vessel, and not Zhang, he presumably would not have entered into an agreement that focused on Zhang rather than on Su and Wang.

Luoyang Intermediate People's Court in China (the "Henan Action"). Stip. Fact 11, Dkt. 226 at 5. Su did not name Yeh as a party in the Henan Action, *see* Stip. Fact 12, Dkt. 226 at 6, and there is no evidence that the Henan court was aware of Yeh's claim or of the Shanghai Judgment, *see* Tr. at 688:25–689:4 (Su's testimony that he could not be sure whether the Henan court was aware of the Shanghai litigation); Henan Judgment, Pl. Ex. 49 (failing to reference the Shanghai litigation). On June 26, 2015, the Henan court found that ownership of the Vessel had been transferred from Zhang to Su. Henan Judgment, Pl. Ex. 49 at 7.

Because Yeh did not know about the purported sale in 2007 of the Vessel from Zhang to Su, Yeh's efforts to check on his fifty percent ownership interest in the Vessel focused on Zhang, whom he understood to be the Vessel's co-owner based on the Shanghai Judgment, and on Chongyuan, which is where he thought the Vessel was physically held. Yeh credibly testified that he made numerous attempts to get in touch with both Zhang and Chongyuan between 2007 and 2018, but that he was ultimately unsuccessful in reaching either party. *See* Tr. at 278:1-3, 278:6–279:18, 283:6-11, 284:4–285:15, 285:22–286:1, 286:11-13, 294:7-10, 296:3-5, 350:14– 351:13, 374:10-14 (detailing Yeh's attempts to contact Zhang); *id.* at 282:13-16, 286:24–287:14, 293:8-16, 295:8-20, 296:3-10, 302:9-15, 311:22–312:14, 318:10-19, 320:1-6 (detailing Yeh's attempts to contact Chongyuan); *see also* Yeh Decl., Pl. Ex. 80 ¶¶ 46, 55–57 (including similar testimony).

On June 17, 2017, Su and Wang sued Sotheby's for breach of contract and replevin to regain possession of the Vessel. *See* Compl., Dkt. 1; Stip. Fact 13, Dkt. 226 at 6. Su and Wang did not name Yeh as a party to the action. *See* Stip. Fact 14, Dkt. 226 at 6. In August 2017, Sotheby's counterclaimed with an interpleader action against Su, Wang, and Yeh so that Su and Yeh's conflicting ownership claims could be adjudicated. *See* Sotheby's Counterclaim, Dkt. 101

at 9–14.[18]  After monumental efforts to effect service on Yeh, including via publication in Taiwanese newspapers, Yeh appeared at a hearing to show cause why a default judgment should not be entered against him.  *See* Hearing Tr., Dkt. 82; Order, Dkt. 77.  On May 24, 2019, Yeh answered the interpleader complaint, asserted a conversion cross-claim against Su and Wang, and sought a declaratory judgment regarding his co-ownership of the Vessel.  *See* Yeh Answer and Cross-Claims, Dkt. 104 at 7–8.  Following discovery and extensive motion practice,[19] the Court held a bench trial on Yeh's conversion claim, which is the only remaining claim in this action.

---

[18]      Sotheby's was later discharged as a disinterested stakeholder, although its motion for fees and costs remains pending, and the Vessel is still in its possession for safekeeping.  *See* Order, Dkt. 112; Not. of Motion, Dkt. 122.

[19]      Su and Wang moved for judgment on the pleadings and later for summary judgment, arguing that Yeh's conversion claim was barred by the applicable statute of limitations.  *See* Not. of Mot., Dkt. 108; Not. of Mot., Dkt. 156.  The Court denied both motions.  *See Wei Su v. Sotheby's, Inc*., No. 17-CV-4577, 2019 WL 4917609 (S.D.N.Y. Oct. 4, 2019); *Wei Su v. Sotheby's, Inc*., 490 F. Supp. 3d 725 (S.D.N.Y. 2020).  Yeh later moved to disqualify Xuejie Wong, Su and Wang's attorney, *see* Not. of Mot., Dkt. 185, and the Court denied that motion as well, *see Su v. Sotheby's, Inc*., No. 17-CV-4577, 2021 WL 3537189 (S.D.N.Y. Aug. 11, 2021).

## CONCLUSIONS OF LAW

### I.  Yeh's Conversion Cross-Claim[20]

Yeh claims that Su and Wang converted his fifty percent ownership interest in the Vessel.
*See* Yeh Answer and Cross-Claims at 7–8.  Both parties agree that Yeh's conversion cross-claim
is governed by New York law.  Stip. of Law, Dkt. 226 at 6–7; Tr. at 885:21–886:2, 888:23–
889:2, 904:9-23.  "Under New York law, '[c]onversion is the unauthorized assumption and
exercise of the right of ownership over goods belonging to another to the exclusion of the
owner's rights.'"  *DeVito v. Neiman*, 548 F. Supp. 3d 314, 317–18 (E.D.N.Y. 2021) (collecting
cases).  Accordingly, to succeed on his claim for conversion, Yeh must prove: "(1) the property
subject to conversion is a specific identifiable thing; (2) [Yeh] had ownership, possession or
control over the property before its conversion; and (3) [Su and Wang] exercised an unauthorized
dominion over the thing in question, to the . . . exclusion of [Yeh's] rights."  *Id.* (cleaned up).
Both parties agree that the Vessel is a specific identifiable thing, *see* Final Pre-Trial Conf. Tr.,
Dkt. 253 at 20:8-15; only elements two and three are in contention.

---

[20]     Yeh also seeks a declaratory judgment regarding his co-ownership of the Vessel.  *See* Yeh Answer and
Cross-Claims, Dkt. 104 at 8.  In deciding whether to entertain an action for a declaratory judgment, a district court
must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues
involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane
Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005); *see also Cont'l Cas. Co. v. Coastal
Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (finding that courts must consider a declaratory judgment when "the
judgment will serve a useful purpose in clarifying and settling the legal relations in issue or when it will terminate
and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding." (cleaned up)).
Accordingly, a cross-claim seeking a declaratory judgment may be dismissed if it does not broaden the scope of the
dispute or if it would not present a live controversy once the other claims have been resolved on the merits.  *See
Arista Recs. LLC v. Usenet.com, Inc.*, No. 07-CV-8822, 2008 WL 4974823, at *4–5 (S.D.N.Y. Nov. 24, 2008); *see
also Singer Asset Fin. Co., LLC v. Melvin*, 33 A.D.3d 355, 358 (1st Dep't 2006) ("[A] plaintiff may not seek a
declaratory judgment when other remedies are available . . . .").

     Here, Yeh is asking the Court to enter a declaratory judgment that he is a co-owner of the Vessel.  To prove
his conversion claim by a preponderance of the evidence under New York law, Yeh must prove that he is a co-
owner of the Vessel.  Put another way, once the Court has adjudicated the conversion claim, there will no longer be
a live controversy with respect to the declaratory judgment.  *See Arista*, 2008 WL 4974823, at *4–5.  Accordingly,
Yeh's cross-claim seeking a declaratory judgment is dismissed.

### A.  Yeh Has Proved by a Preponderance of the Evidence that He Is a Fifty Percent Co-Owner of the Vessel

To prevail on a conversion claim, a plaintiff[21] "must recover on the strength of the plaintiff's own title or right to possession," and absent a showing that the plaintiff ever owned the property, the plaintiff cannot maintain an action for conversion.  23 N.Y. Jur. 2d Conversion, Etc. § 14 (collecting authority under New York law).  As discussed *supra*, Yeh testified credibly that he purchased the vessel from Lin in 2002 for $600,000 dollars.  Although on cross-examination it became clear that certain aspects of the purchase may have been unorthodox, the Court finds that Yeh has proved that he owned the Vessel as of 2002.[22]

The Court further finds, based on the Shanghai Judgment, that Yeh is a fifty percent co-owner of the Vessel.  The Shanghai court, as reflected in the Shanghai Judgment, credited the bona fides of the June 2, 2005 agreement, *see* Agreement, Pl. Ex. 3, and found that the "Agreement has clearly confirmed the co-ownership of the disputed bronzeware between YEH Yao Hwang and ZHANG Shen Bao."  Shanghai Judgment, Pl. Ex. 4 at 16.  The Shanghai Higher People's Court confirmed the findings of the lower court, *see id.* at 15, which concluded that, although "[c]o-owners have the right to possess, use and benefit from the co-owned item," the June 2, 2005 Agreement gave Zhang the right to possess the Vessel, *see id.* at 12–13.[23]

The Court adopts the findings in the Shanghai Judgment under the doctrine of collateral estoppel.  "The fundamental notion of the doctrine of collateral estoppel . . .  is that an issue of

---

[21]    Although Yeh's conversion claim against Su and Wang is a cross-claim, for ease, the Court refers to Yeh as Plaintiff and to Su and Wang as Defendants.

[22]    The Court further finds that the photographs of Yeh with the Vessel in his home are persuasive evidence that he owned the Vessel, at least through the time the photos were taken.  *See* Pl. Ex. 85 at 2, 3 (photos of Yeh, the Vessel, and his nieces); Pl. Ex. 83 at 7, 9, 11, 13, 15, 17 (photos of Yeh, the Vessel, and various other individuals).

[23]    During closing arguments, Su and Wang's counsel reluctantly agreed that, as of the date of the Shanghai Judgment, Yeh had a fifty percent ownership interest in the Vessel.  *See* Tr. at 908:3-8.

law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the parties or their privies." *Constantine v. Tchrs. Coll.*, 448 F. App'x 92, 93 (2d Cir. 2011) (quoting *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008)). To benefit from collateral estoppel, a party must establish four elements: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation omitted).

The elements of collateral estoppel are satisfied here. As an initial matter, both the Shanghai litigation and this lawsuit involve the same parties or their privies. Yeh was a party to both lawsuits. Su, a party to this lawsuit, is in privity of contract with Zhang, a party to the Shanghai litigation, through his purported purchase of the Vessel. *See* Sales Contract, Pl. Ex. 86; Tr. at 601:2-6, 602:9-12, 621:4-10, 619:18–620:8, 623:10-22, 635:11-13 (detailing Su's purchase of the Vessel from Zhang). And Wang, a party to this lawsuit, is Su's agent through a series of powers of attorney, *see* Power of Attorney, Pl. Ex. 21; Power of Attorney, Pl. Ex. 22, so Su's privity with Zhang applies to Wang as well. *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 506 (2d Cir. 2019) (discussing the recognized exceptions to the rule against nonparty preclusion, including for agents and proxies). Moreover, the four elements of the collateral estoppel doctrine are met. The issue of the Vessel's ownership was raised in the Shanghai litigation; it was actually and fully litigated through three different courts; and its resolution was necessary to support the judgment, which was on the merits. Accordingly, under

the doctrine of collateral estoppel, the Court adopts the Shanghai Judgment's finding that, at the time of the Judgment, Yeh co-owned the Vessel.

Defense counsel made numerous arguments relating to the Shanghai Judgment, none of which is persuasive. Defense counsel initially objected to the admissibility of the Shanghai Judgment on the grounds that it was not certified pursuant to Rule 902(3) of the Federal Rules of Evidence. Final Pre-Trial Conf. Tr., Dkt. 253 at 36:4–39:11. The Court treated the Shanghai Judgment as presumptively authentic pending certification. *Id.* at 39:17-21. Yeh presented a certified copy of the Shanghai Judgment after the conclusion of the bench trial. *See* Certified Shanghai Judgment, Dkt. 275-1. The Court provided Su and Wang another opportunity to object to the Shanghai Judgment's admissibility, *see* Endorsement, Dkt. 276, but after Su and Wang did not respond by the deadline, the Court admitted the Shanghai Judgment, *see* Endorsement, Dkt. 277.[24]

Counsel for Su and Wang next argued, perhaps in the alternative although it was not entirely clear, that even if the Shanghai Judgment found Yeh and Zhang to be co-owners, Yeh had not proved that meant he had a fifty percent ownership interest, as opposed to some other percentage. *See* Tr. at 19a:11–20a:16, 877:20–888:3. The Court rejects that argument. A plain reading of the Shanghai Judgment — which expressly states that Yeh and Zhang are co-owners and does not state that one party has more of an ownership interest than the other, *see* Shanghai Judgment, Pl. Ex. 4 at 16 — is that Yeh and Zhang each held an undivided fifty percent ownership interest in the Vessel.

---

[24]   Su and Wang presented no evidence that even remotely suggested that the Shanghai Judgment (including the translation) was not the actual judgment of the Shanghai Higher People's Court. Moreover, Su and Wang affirmatively relied on the Shanghai Judgment before this litigation was commenced when attempting to persuade Sotheby's that it should return the Vessel to them. *See, e.g.*, Jan. 12, 2015 Letter Pl. Ex. 46 (citing the Shanghai Judgment and contending that it does not grant Yeh "any right of custody").

Although Defense counsel did not clearly invoke the Henan Action,[25] liberally construed, Defendants may have been arguing that the judgment in the Henan Action, which found Su to be the sole owner of the Vessel, *see* Henan Judgment, Pl. Ex. 49, extinguished any ownership interest held by Yeh.  Assuming that was their argument, the Court disagrees.  That finding in the Henan Judgment does not have collateral estoppel effect because the requirement that the prior action involve the "same parties or their privies" is not met.  The Henan Action was between Su and Zhang; Yeh was not a party, and his interests were not otherwise represented.  Moreover, there is no evidence that the Henan court was aware of the Shanghai Judgment or its award of co-ownership of the Vessel to Yeh.  *See* Tr. at 688:25–689:4.  Accordingly, because the doctrine of collateral estoppel does not apply to the Henan court's finding that Su was the sole owner of the Vessel, the Court declines to assign any weight to the Henan Judgment.[26]

In short, Yeh has proved, by a preponderance of the evidence, that he is a fifty percent owner of the Vessel, satisfying the second element of his conversion cross-claim.

---

[25]      In fact, at one point, counsel for Su and Wang took the position that the judgment of the Henan court was irrelevant, *see* Tr. at 890:25–891:4, although she later abandoned that position, *see id*. at 905:3-23.

[26]      The Court also disregards Defense counsel's last-ditch argument that Yeh does not own any part of the Vessel held by Sotheby's because he cannot prove that the Vessel in Sotheby's possession is not a counterfeit.  *See id*. at 369:20–370:6; 580:5-11; 864:2-12.  Not only is that argument silly, but it also contradicts Wang's testimony that she verified the Vessel's authenticity before giving possession of it to Sotheby's.  *See id*. at 18b:21-25, 120b:14-18 (Wang's testimony that she had the Vessel authenticated at the appropriate government office because she was concerned that it may not be genuine); *id*. at 239:10-25 (confirming that the Vessel Wang authenticated at the government office is the same Vessel currently held by Sotheby's).

**B. Yeh Has Proved by a Preponderance of the Evidence that Su and Wang Exercised Unauthorized Dominion over the Vessel to the Exclusion of his Rights**[27]

**1. Su's Unauthorized Dominion over the Vessel**

Yeh argues that Su committed the tort of conversion in 2007 when he purchased the Vessel from Zhang, even though Yeh owned fifty percent of the Vessel and had not authorized its sale.[28]  *Id.* at 273:21–274:1, 275:21-282:3; 762:16-21.  A purchase of personal property from one not authorized to sell the property constitutes conversion under New York law.  *See* 23 N.Y. Jur. 2d Conversion, Etc. § 28 (citing *Newton v. Porter*, 69 N.Y. 133, 136–37 (1877)).

The date on which the tort of conversion occurs depends on whether the purchaser is a bona fide purchaser for value.[29]  "[A]n innocent purchase from a thief is not a conversion," but the innocent purchaser commits the tort of conversion if he subsequently refuses to surrender possession to the lawful owner.  *Id.* (citing *Emps.' Fire Ins. Co. v. Cotten*, 245 N.Y. 102 (1927); *Mitchell v. Colonial Tr. Co.*, 41 N.Y.S.2d 562 (N.Y. Cnty. Ct. 1943)).  Put another way, a "bona fide purchaser who performs no wrongful act relative to a plaintiff's goods is ensured an opportunity to deliver the property to the true owner before he or she is liable as a tortfeasor for a wrongful conversion."  *Id.*; *see also St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 179

---

[27]    At the Final Pretrial Conference, Defense counsel admitted that Su and Wang exercised unauthorized dominion over the Vessel to the exclusion of Yeh's rights.  *See* Final Pre-Trial Conf. Tr., Dkt. 253 at 21:17-22. Because the Court makes additional findings about the circumstances of Su and Wang's unauthorized dominion, the Court will discuss this element.

[28]    It is of no moment to Yeh's conversion claim that he is only a fifty percent owner of the Vessel.  Under New York law, an individual or entity's partial ownership of a property may be converted by a third party.  *See* 23 N.Y. Jur. 2d Conversion, Etc. § 21 ("[W]here a person is justified in asserting ownership of a portion of certain goods, or a part ownership of them, an act committed under an assertion of ownership of more than is permissible amounts to a conversion as to such a portion." (collecting cases)); *see also Chigirinskiy v. Panchenkova*, No. 14-CV-4410, 2015 WL 1454646, at *18 (S.D.N.Y. Mar. 31, 2015).

[29]    "A bona fide purchaser for value has been described as one which purchased property for 'valuable consideration' and with no 'knowledge' of an 'alleged prior fraud by the seller.'"  *Irwin v. Regal 22 Corp.*, 175 A.D.3d 671, 672 (2d Dep't 2019) (internal citation omitted) (collecting cases).

16

(E.D.N.Y. 2010) ("If the party in possession has not acquired possession wrongfully, and has not otherwise exercised wrongful dominion over the property, the possessor does not convert the property until he refuses a demand for its return from a party with a superior and immediate right of possession."); *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 510 (S.D.N.Y. 2013) (reiterating the same holding).  On the other hand, when a purchase is not bona fide, demand and refusal are not necessary for the tort of conversion to be complete.  "[W]here the one in possession of goods owned by another acquired such possession unlawfully, no demand is necessary before instituting an action for conversion since the sole object of a demand and refusal is to supply evidence of conversion, and the unlawful acquisition of the property is in itself a positive act of conversion."  23 N.Y. Jur. 2d Conversion, Etc. § 48 (collecting cases).

Before trial, Su claimed that he was a bona fide purchaser of the Vessel.  *See, e.g.*, Su 2017 Decl., Dkt. 21-1 ¶¶ 1, 6.  At trial, Su testified that he was not aware of Yeh's ownership interest or the Shanghai Judgment when he purchased the Vessel from Zhang.  *See* Tr. at 685:1-3.[30]  Despite that testimony, and likely to take advantage of the earlier accrual of the claim as discussed *infra*, Defense counsel argued that Su was not a bona fide purchaser.  *See id.* at 880:18 (Su "was not a bona fide purchaser"); *id.* at 880:12-13 ("I don't have any evidence that [Su] was a bona fide purchaser.").[31]  Based on the parties' agreement and the fact that Su's testimony on this point was not credible, the Court finds that Su was not a bona fide purchaser of the Vessel; he converted Yeh's fifty percent ownership interest in the Vessel when he purchased and took possession of it from Zhang in 2007.

---

[30]     Su also testified that he did not ask Zhang whether he owned the Vessel, and he did not ask for any documentation confirming Zhang's ownership.  Tr. at 621:20–622:3.

[31]     Yeh's counsel also argued that Su was not a bona fide purchaser of the Vessel.  *Id.* at 840:9-13.

## 2.  Wang's Unauthorized Dominion over the Vessel

The Court finds that Wang exercised unauthorized dominion over Yeh's fifty percent

interest in the Vessel when she took possession of the Vessel at the Hong Kong airport in June

2014.[32]  *Id.* at 6b:14-22.  A "defendant assumes dominion over the property by refusing to return

it, by disposing of it, by misusing it, or by otherwise dealing with it in a manner inconsistent with

the owner's rights, regardless of whether the defendant acted in good faith or in ignorance of the

plaintiff's interest in the property."  23 N.Y. Jur. 2d Conversion, Etc. § 18 (collecting cases under

New York law).  It is undisputed that Yeh did not authorize Wang to take possession of the

Vessel.  *See* Tr. at 305:16-20, 387:4-8.  Accordingly, Wang's possession of the Vessel

constituted unauthorized dominion.[33]

To determine when Wang converted the Vessel, the Court must consider whether Wang's

possession was in good or bad faith.  The Court concludes that Yeh did not prove by a

preponderance of the evidence that Wang took possession of the Vessel in bad faith.  Wang

testified that she did not ask Szutu for information about the Vessel's ownership when she first

met with him regarding the Vessel.  *See id.* at 59a:6-9, 60a:5-11.  She then received the Vessel

from Szutu's brother later that month.  *See id.* at 6b:14-22.  Although the Court finds that

---

[32]      Yeh did not make this argument at trial; instead, Yeh's position was that the conversion occurred in 2007
when the Vessel was sold to Su.  *Id.* at 762:16-21.  But Yeh provided no argument or authority to support his
contention that Su's conversion of the Vessel in 2007 can be imputed to Wang.  Although Wang is Su's agent
through a series of powers of attorney, *see* Power of Attorney, Pl. Ex. 21; Power of Attorney, Pl. Ex. 22, the
evidence shows that their agency relationship began in 2014, seven years after Su had converted the Vessel.

        Although Yeh did not address the timing of Wang's conversion of the Vessel, Yeh did present sufficient
evidence for the Court to conclude that Wang converted the Vessel in 2014, when she took possession of the Vessel,
traveled with it to Shanghai, and transferred it to Sotheby's to be sold at auction, all without Yeh's authorization.
Accordingly, with respect to the claim against Wang, the Court focuses on that set of circumstances.

[33]      Wang's role as a Su's agent does not absolve her of liability for her own conversion of the Vessel.  *See
Weyant v. Phia Grp. LLP*, No. 17-CV-8230, 2018 WL 4387557, at *8 (S.D.N.Y. Sept. 13, 2018) ("An agent is liable
for conversion, even if committed for the benefit of the principal or without intent." (collecting authority)).

Wang's testimony was generally not credible, *see supra* note 15, there is insufficient evidence from which the Court can conclude that Wang knew of Yeh's ownership interest when she took possession of the Vessel.  Because Yeh failed to prove that Wang was not a good faith purchaser, she "d[id] not convert the property until [s]he refuse[d] a demand for its return." *St. John's Univ., N.Y.*, 757 F. Supp. 2d at 179.  Accordingly, Wang's conversion of the Vessel occurred in September 2014, after Yeh informed Sotheby's of his ownership interest, Sotheby's notified Wang of Yeh's ownership claim, and Wang refused to recognize Yeh's interest in the Vessel. *See* Stip. Facts 5–8, Dkt. 226 at 5.

In short, Yeh has met his burden of proving that Su, in 2007, and Wang, in 2014, converted his fifty percent interest in the Vessel.

## II.     Su and Wang's Statute of Limitations Defense

Su and Wang argue that Yeh's conversion cross-claim is time-barred.  New York applies a three-year statute of limitations to conversion claims.  N.Y. C.P.L.R. § 214(3).  As discussed in the preceding section, the conversion claims against Su and Wang accrued in 2007 and 2014, respectively.[34]

Yeh filed his conversion cross-claim on May 24, 2019.  Yeh Answer and Cross-Claims, Dkt. 104 at 7–8.  Because 2019 is more than three years after both 2007 and 2014, if Yeh were unable to prove that the statute of limitations was tolled, his claim would be time-barred and Su and Wang would prevail in this action.

---

[34]     Had Su been a bona fide purchaser of the Vessel, the conversion claim against him would have accrued in 2014.  The Court suspects that Su's counsel contended that Su was not a bona fide purchaser of the Vessel, *see* Tr. at 880:12-13, 880:18, despite Su's trial testimony, *see* Tr. at 685:1-3, Tr. at 621:20-622:3, because that fact means that Yeh must prove that the statute of limitations was tolled for a much longer period — 2007-2019 as opposed to 2014-2019.

### III.   Pursuant to the Doctrine of Equitable Estoppel, Yeh's Conversion Cross-Claim Is Timely

"Equitable estoppel will preclude a defendant from using the statute of limitations as a defense where it is the defendant's affirmative wrongdoing which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Putter v. N. Shore Univ. Hosp.*, 7 N.Y.3d 548, 552 (2006) (citations omitted).  To prevail on equitable estoppel, Yeh must (1) articulate particular acts by the defendants that prevented the timely filing of an action, including any engagement in a concealment scheme; and (2) meet the due diligence requirement by proving that the action was brought within a reasonable time after the facts giving rise to the estoppel ceased.[35]  *See generally Wei Su v. Sotheby's, Inc.*, 490 F. Supp. 3d 725, 730–31, 733–34 (S.D.N.Y. 2020) (detailing the requirements of equitable estoppel under New York law and collecting cases);[36] *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) ("[T]he plaintiffs bear the burden of proving that a particular statute of limitation has been tolled." (cleaned up)).

#### A.   Affirmative Acts of Concealment[37]

Yeh has proved by a preponderance of the evidence that Wang and Su's affirmative acts of concealment prevented him from filing his conversion claim earlier.  Courts have found that defendants may be equitably estopped from asserting a statute of limitations defense when they

---

[35]   The outer limit is the "statute of limitations measured from the date when the facts giving rise to the estoppel have ceased to be operational." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 443 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (collecting cases).

[36]   The Court incorporates by reference its detailed legal analysis of equitable estoppel from its summary judgment opinion.  *See Wei Su*, 490 F. Supp. 3d at 730–31, 733–34.

[37]   Because the period between the accrual of the conversion claim against Wang and the filing of Yeh's claim (2014-2019) is subsumed in the pertinent period with respect to the conversion claim against Su (2007-2019), the Court does not separately address the two periods of time.

are engaged in a concealment scheme to hide their involvement or identity in particular

wrongdoing.  *See Wei Su*, 490 F. Supp. 3d at 730–31 (discussing *Farkas v. Farkas*, 168 F.3d 638

(1999); *Markel Am. Ins. Co. v. Grimaldi*, No. 10-CV-5447, 2012 WL 1020424, at *1, *5

(E.D.N.Y. Feb. 10, 2012), *report and recommendation adopted*, No. 10-CV-5447, 2012 WL

1020409 (E.D.N.Y. Mar. 26, 2012)).

At trial, Yeh argued that Su and Wang colluded with Zhang, Szutu, and several other

individuals associated with Chongyuan, including Ji Chong Jian and Wu Ji, in an elaborate

scheme to conceal their conversion of the Vessel.  *See* Tr. at 850:23-852:8; *see also id.* at

294:20–295:20.  The Court concludes that Yeh has proved by a preponderance of the evidence

that a concealment scheme existed and was active from 2007 to 2018.  As described in detail

below, Yeh has proved that, despite knowing about Yeh's fifty percent interest in the Vessel,

those involved in the scheme colluded to convert the Vessel and to attempt to sell the Vessel,

first at Chongyuan and then at Sotheby's, and the members of the scheme actively concealed

their actions from Yeh, preventing him from filing his conversion claim in a timely manner.

### 1.  Members of the Concealment Scheme Knew About Yeh's Fifty Percent Ownership Interest in the Vessel

As an initial matter, the Court finds that those involved in the concealment scheme,

including Su, Zhang, Szutu, and individuals associated with Chongyuan, like Ji Chong Jian and

Wu Ji, were aware of Yeh's fifty percent ownership interest in the Vessel.[38]  Because defense

counsel conceded that Su was not a bona fide purchaser of the Vessel, *see id.* at 880:12-13, 18,

the Court concludes that Su was aware that Zhang was not the sole owner of the Vessel when he

---

[38]     Although Yeh is not required to prove that all members of the scheme knew about his ownership interest to prevail on an equitable estoppel argument, the fact that members of the scheme knew about Yeh's interest explains why they were motivated to conceal their actions and further supports the conclusion that the concealment scheme existed.

purchased it.  Additionally, Yeh has also proved that Zhang knew of Yeh's ownership interest: Zhang's actions were what led to the ownership dispute in the first place, and he was an active party to the Shanghai litigation, which ultimately concluded that Zhang and Yeh co-owned the Vessel.  Accordingly, the Court concludes that Su and Zhang more likely than not were aware of Yeh's ownership interest in the Vessel.

Yeh has also proved by a preponderance of the evidence that individuals associated with Chongyuan, including Ji Chong Jian and Wu Ji, knew about Yeh's ownership interest in the Vessel.  Yeh tried to auction the Vessel at Chongyuan in 2005.  *Id.* at 91a-24–92a:9.  Yeh credibly testified that he chose Chongyuan because he considered Ji Chong Jian, who held a senior role at the auction house, to be an expert in bronzeware.  *See id.* at 92a:10-15.  As part of the consignment process, Yeh met with Ji Chong Jian and gave him power of attorney.  *See id.* at 101a:22-24, 259:25–260:15, 261:7-8; *see also* Photographs, Pl. Ex. 83 at 13, 17 (depicting Yeh, the Vessel, and Ji Chong Jian); Photograph, Pl. Ex. 83 at 15 (depicting Ji Chong Jian and another Chongyuan representative inspecting the Vessel).  Ji Chong Jian also assisted in researching the Vessel's history.  Tr. at 112a:21–113a:4.  Yeh testified that Chongyuan, through Ji Chong Jian, gave him a written warranty that it would return the Vessel to him if the auction failed.  *Id.* at 263:11-23.

After the auction failed in early 2006, Yeh asked Ji Chong Jian to return the Vessel to him.  *Id.* at 264:5-12.  According to Yeh, Chongyuan refused to return the Vessel, citing a purported agreement signed by Zhang, Yeh, and Chongyuan.  *See id.* at 117a:2-6, 118a:9-12, 264:7-12, 265:1-17, 269:4-11.  That document included the Chongyuan seal and Ji Chong Jian's signature.  *See* Agreement, Pl. Ex. 3; Shanghai Judgment, Pl. Ex. 4 at 11.[39]  It was Chongyuan's

---

[39]     The English translation of the agreement does not include Ji Chong Jian's signature.  *See* Agreement, Pl. Ex. 3 at 3.  The Court notes that in the Chinese-language version, there does appear to be a signature over the seal.

refusal to return the Vessel that led to the Shanghai litigation and, ultimately, to the judgment that found Yeh to be a co-owner of the Vessel. *See* Shanghai Judgment, Pl. Ex. 4. Chongyuan was a party to the Shanghai litigation and was mentioned extensively in the resulting judgment. *See id.* at 10 (listing Chongyuan as a party); *id.* at 11 (describing the 2005 consignment of the Vessel to Chongyuan and the June 3, 2005 agreement bearing Ji Chong Jian's signature); *id.* at 12 (recounting that both Zhang and Yeh demanded return of the Vessel); *id.* at 13–15 (finding Chongyuan partially liable for not returning the Vessel to Zhang).

Given Ji Chong Jian's extensive involvement in the events just described, a preponderance of the evidence supports the conclusion that Ji Chong Jian was aware of the Shanghai Judgment and knew it awarded Yeh co-ownership of the Vessel. Although the Court would have preferred to hear from Ji Chong Jian directly, given his role in the failed 2005-2006 auction, his refusal to return the Vessel to either Zhang or Yeh, the fact that his actions are what spurred the Shanghai litigation in the first place, the fact that he and Chongyuan are mentioned throughout the Shanghai Judgment, and the fact that he is an expert in bronzeware who presumably has an interest in ancient Chinese artifacts like the Vessel, based on the undisputed evidence that was presented, the Court finds that it is more likely than not that Ji Chong Jian was aware of the outcome of the Shanghai litigation and of Yeh's fifty percent ownership interest in the Vessel.

The Court also finds that Wu Ji, Chongyuan's attorney at the time of the 2005-2006 auction, more likely than not knew of Yeh's ownership interest in the Vessel. The Court credits Yeh's testimony that he met with Wu Ji on three separate occasions in 2005 to arrange for the consignment of the Vessel to Chongyuan. Tr. at 108a:25–109a:6, 110a:24–111a:1, 111a:8-21,

---

*Id.* at 2. Relying on the doctrine of collateral estoppel, the Court adopts the finding in the Shanghai Judgment that Ji Chong Jian signed the agreement. *See* Shanghai Judgment, Pl. Ex. 4 at 11.

262:15-20. Yeh testified that each meeting lasted about an hour and a half. *Id.* at 108a:25–109a:6. He also testified that, at one of those meetings, Wu Ji gave him his business card, which Yeh kept. *See id.* at 109a:10–110:4; Business Card, Pl. Ex. 88. As Chongyuan's attorney, Wu Ji was involved in negotiating the terms of the consignment agreements that were discussed in the Shanghai Judgment. *See* Shanghai Judgment, Pl. Ex. 4 at 11–12, 15; *see also* Tr. at 106a:1-11, 108a:3-24, 259:25–260:15, 261:7-8, 427:8-18. Considering that evidence as a whole, it is more likely than not that Wu Ji was at least generally aware — if not intimately aware — of the outcome of the Shanghai litigation.[40]

Additionally, the Court finds that Szutu more likely than not knew about Yeh's ownership interest in the Vessel. Yeh credibly testified that Szutu participated in a dinner meeting with Yeh and Zhang on May 31, 2005, about the terms of the $1 million loan from Zhang and about auctioning the Vessel. Tr. at 99a:24–100a:9, 296:13–297:11, 340:18-22, 497:23–498:5. Yeh further credibly testified that Szutu was present at a second meeting about the loan held on June 2, 2005, at Zhang's office. *Id.* at 121:6-8. Although the nature of the relationship between Szutu and Zhang is unclear,[41] Szutu's involvement in Zhang's loan to Yeh, including with respect to the Vessel, and Szutu's continued involvement in every meaningful event in this litigation, indicate that it is more likely than not that he knew about the loan from Zhang to Yeh, the failure of the 2005-2006 auction, and the Shanghai Judgment, which concluded that Zhang and Yeh were co-owners of the Vessel.

---

[40]     Although the details were not fully developed at trial, it is reasonable to infer that Chongyuan kept tabs on the Shanghai litigation because its outcome affected Vessel-related debts owed to Chongyuan. *See* Sales Contract, Pl. Ex. 86 at 2 (mentioning 880,000 RMB owed to Chongyuan); Zhang Oct. 30, 2014 Statement to Sotheby's, Pl. Ex. 13 (referring to the heavy debts, including a custodian fee, related to the Vessel).

[41]     Yeh testified that he believed Szutu worked for Zhang, *see* Tr. at 296:13-22, 340:18-22, while Su testified that Zhang and Szutu were friends who had conducted business together in the past, *see id*. at 600:1-2, 746:20-25.

In short, the Court finds that Yeh has proved by a preponderance of the evidence that Su, Zhang, Ji Chong Jian, Wu Ji, and Szutu all knew that Yeh had an ownership interest in the Vessel.

### 2. Members of the Scheme Colluded to Sell the Vessel at Auction

Yeh has proved by a preponderance of the evidence that, despite knowing that Yeh had an ownership interest in the Vessel, those involved in the concealment scheme colluded to sell the Vessel at auction.[42]  Based on the record before the Court, Zhang's sale of the Vessel, without authorization from Yeh, the co-owner of the Vessel, constituted conversion in it of itself. *Id.* at 273:21–274:1.  Szutu facilitated Zhang and Su's conversions.  Su credibly testified that: Szutu proposed that Su buy the Vessel from Zhang, *see id.* at 598:3-7; Szutu was present at multiple meetings between Su and Zhang, *see id.* at 598:3-7, 600:20-23, 620:20-22; Szutu was the one who persuaded Su to sign the sales contract between Zhang and Su without reading it, *see id.* at 603:13-16, 620:10-19; Szutu was present when Su provided Zhang with four checks for the purchase (all of which bounced), *see id.* at 634:10-23; and Su entrusted the Vessel to Szutu, who stored it at his brother's home in Hong Kong for several years, *see id.* at 683:2-16, 703:21–704:2.

Although individuals at Chongyuan may have been aware of Zhang and Su's conversion of the Vessel in 2007,[43] even if they had not been, those associated with Chongyuan more likely

---

[42]      Yeh is not required to prove that members of the concealment scheme worked together to convert the Vessel and sell it at auction in order to prevail on his equitable estoppel theory.  But the fact that members of the scheme colluded to sell the Vessel, despite knowing of Yeh's ownership interest, supports the conclusion that members of the scheme were motivated financially to conceal their actions from Yeh.

[43]      Although the sales contract mentions Chongyuan and includes a requirement that Su must direct some of the payment for the Vessel to Chongyuan, *see* Sales Contract, Pl. Ex. 86 at 2, neither side presented any evidence that Chongyuan actually received such payment or that individuals associated with the company were otherwise aware of the 2007 sale of the Vessel from Zhang to Su.

25

than not became aware of the conversion by 2011, when Chongyuan attempted to sell the Vessel at a rigged auction.  *See* 2011 Consignment Agreement, Pl. Ex. 6 (signed by Szutu and a representative of Chongyuan); Tr. at 663:11–665:5 (describing attempts to rig the auction).  It strains credulity that representatives of Chongyuan, who had been so involved in the initial ownership dispute between Zhang and Yeh following Chongyuan's first failed auction in 2005-2006, were unaware of Yeh's ownership interest when it again agreed to attempt to auction the Vessel in 2011.  Moreover, Szutu, who was involved in the 2007 conversion of the Vessel, was also responsible for facilitating this attempt to auction the Vessel: Su credibly testified that he gave Szutu power of attorney to arrange for the auction, *see* Tr. at 654:21-24; Szutu signed the consignment agreement with Chongyuan, *see* 2011 Consignment Agreement, Pl. Ex. 6; Szutu told Su that Chongyuan had tried to rig the auction, *see id.* 663:11–665:5; and Szutu informed Su that the auction had failed, *see id.* at 681:11-24.

Szutu and individuals affiliated with Chongyuan also colluded as part of the scheme to try to sell the Vessel at a Sotheby's auction in 2014.  Su testified that he understood that Sotheby's had approached Chongyuan about the auction, *see id.* at 658:23–659:25, Szutu then told Su about it, *see id.* at 658:23–659:25, and Su again gave Szutu power of attorney to make the arrangements, *see id.* at 652:7-25; Power of Attorney, Pl. Ex. 22.  Moreover, Wang is affiliated with Chongyuan.  In June 2014, Szutu met with Wang[44] and gave her power of attorney to arrange for the consignment of the Vessel to Sotheby's.  *See* Tr. at 51a:9-14, 51a:20-22;

---

[44]     Wang testified that she has known Szutu since 2012 or 2013.  Tr. at 51a:2-3.

Power of Attorney, Pl. Ex. 21.[45]  At the time, Wang was a thirty percent shareholder[46] of Chongyuan[47] and its legal representative.  *See* Tr. at 26a:5-7; 220:14-23, 220:25–221:3.

Despite those facts, Wang — incredibly — testified that she arranged for the consignment of the Vessel to Sotheby's in her personal capacity and not as a representative of Chongyuan.  *See id.* at 31b:1-7, 55a:4-20.  The Court does not credit that testimony; Wang met with Szutu about the consignment at the Chongyuan office, *see id.* at 54a:4-9, 54a:20-21, and she then spoke with Ji Chong Jian, who held a senior position at Chongyuan, about the consignment, *see id.* at 25b:7–29:25.  Additionally, a representative of Chongyuan would have received an introductory commission from Sotheby's if the Vessel had sold at auction.  *See* July 22, 2014 Draft Consignment Agreement, Pl. Ex. 87 at 2 (stating that Ji Chong Jian will receive an introductory commission); Aug. 11, 2014 Signed Consignment Agreement, Pl. Ex. 51 at 4 (stating that Ya Ying Tian[48] will receive an introductory commission).  Considering Chongyuan's extensive involvement in the consignment of the Vessel to Sotheby's, the Court concludes that it is more likely than not that various individuals associated with Chongyuan,

---

[45]     Wang testified that it was Szutu who tasked her with getting the Vessel from Szutu's brother in Hong Kong and taking it to Shanghai to be authenticated at the Cultural Relics Administrative Office ("CRAO").  *See id.* at 6b:2-22.  She further testified that she kept Szutu informed about her progress at customs and at CRAO.  *Id.* at 24b:21-25b:6.

[46]     Wang testified that she purchased her Chongyuan shares in 2011 for 3 million RMB.  *Id.* at 26a:5-7, 221:4-6.  The Court takes judicial notice of the fact that, in 2011, 3 million RMB was worth approximately $450,000 dollars.

[47]     Wang's testimony about how she became a shareholder of Chongyuan was riddled with inconsistencies.  Although she initially testified that she bought her shares from Ji Zhong Yue, *see Id.* at 27a:11-13, 31a:4-10, 44a:7-10, she later clarified that, after checking her records, she realized that she had actually purchased her shares from Ji Chong Jian, *see id.* at 216:8-15, 220:14-23.  The Court makes no finding as to whether Ji Zhong Yue and Ji Chong Jian are the same person, as that issue is unrelated to Yeh's conversion claim.

[48]     Wang testified that Ya Ying Tian had been a shareholder of Chongyuan since at least 2011, *see id.* at 31a:4-7, and that, in 2014, he was a twenty-five percent shareholder of the company, *see id.* at 42b:22-24.

along with Szutu, colluded to attempt to sell the Vessel at auction at Sotheby's, despite Yeh's ownership interest.

After Yeh made a competing claim to Sotheby's, causing Sotheby's to withdraw the Vessel from auction, Szutu, Zhang, and individuals associated with Chongyuan continued to scheme to recover the Vessel — despite Yeh's ownership interest.  Wang asked Ji Chong Jian to get involved, including by asking him to deliver documents to Sotheby's.  *See* Tr. at 62b:6-8, 92b:22–93b:5, 216:23–217:3; Wang Sept. 14, 2014 Email to Sotheby's, Pl. Ex. 58 at 6.  Wang further testified that it was Szutu who authorized Ji Chong Jian to attempt to recover the Vessel. Tr. at 30a:18-23.  Additionally, in an email threatening legal action against Sotheby's for failure to return the Vessel, Wang noted that it may be "difficult" for Sotheby's to explain its actions to Ji Chong Jian.  Wang Sept. 15, 2014 Email to Sotheby's, Pl. Ex. 59 at 6.  Ji Chong Jian's involvement persuades the Court to find as fact that Chongyuan more likely than not continued to play a role in the efforts to recover the Vessel in derogation of Yeh's ownership interest.

Additionally, Wu Ji, the attorney who represented Chongyuan during the 2005-2006 auction and who knew about Yeh's ownership interest, *see* p. 23–24, *supra*, was also involved in attempting to recover the Vessel from Sotheby's, despite Yeh's interest.  Su testified that Szutu hired Wu Ji to represent him to recover the Vessel from Sotheby's.  Tr. at 713:16-22.  Wang testified that she also retained Wu Ji, but that Wu Ji did not charge her for his services because they were friends.  *Id.* at 101b:4–102b:13; *see also id.* at 102b:19-22 (Wang's testimony that she informed Szutu that she had retained Wu Ji).  As part of his representation of Su and Wang, Wu Ji corresponded with Sotheby's, demanding return of the Vessel and threatening legal action. *See* Sept. 23, 2014 Letter Pl. Ex 43; Sept. 29, 2014 Letter Pl. Ex. 44; Dec. 30, 2014 Letter Pl. Ex 45; Jan. 12, 2015 Letter Pl. Ex. 46; July 27, 2015 Letter Pl. Ex. 47; Aug. 31, 2015 Letter, Pl. Ex.

48.  In none of the correspondence introduced into evidence did Wu Ji disclose his prior involvement with Yeh or the Vessel.

Zhang also colluded as part of the scheme to persuade Sotheby's to return the Vessel, despite Yeh's ownership rights.  On October 30, 2014, he purportedly signed a statement claiming that Su alone owned the Vessel and that he had informed Yeh of the sale to Su.  *See* Oct. 30, 2014 Zhang Statement, Pl. Ex. 13 at 13.  Although Sotheby's rejected the statement as proof of ownership, *see* Tr. at 85b:4-8, Szutu gave that document to Wang, and Wang provided it to Sotheby's, *see id.* at 81b:14–82b:3.  Zhang's purported provision of that letter to Sotheby's — via Szutu and Wang — further shows collusion by members of the scheme, and as discussed *infra*, constitutes an act of concealment by those involved in the scheme to recover the Vessel in derogation of Yeh's ownership rights.

The primary members of the scheme, Szutu, Ji Chong Jian, Wu Ji, and Wang, all met with Sotheby's representatives in Hong Kong on November 18, 2014.  *See id.* at 191:1-4, 206:8-21, 712:3-6; *see also* Sotheby's Decl., Dkt. 27 ¶ 14 (confirming the attendees at the meeting).  In a sworn declaration, Sotheby's representative Stacey Chervin Sigda stated that, at the meeting, Sotheby's proposed that Su liaise directly with Yeh and that Su meet with Zhang and Yeh to resolve the dispute.  Sotheby's Decl. ¶ 14.  Sigda further stated in her affidavit that counsel for Su rejected that proposal.  *Id.*

In short, Yeh has proved by a preponderance of the evidence, that Szutu, Ji Chong Jian, Wu Ji, and Zhang colluded with Su and Wang to sell the Vessel at auction in derogation of Yeh's rights.

### 3. Members of the Scheme Took Active Steps to Conceal their Actions from Yeh

Most relevant to Yeh's equitable estoppel theory, the members of the scheme took several affirmative acts, between 2007 to 2018, to conceal the conversion from Yeh. Yeh has proved by a preponderance of the evidence that the members of the scheme, including Su and Wang, took the following affirmative actions to conceal the conversion: (a) between 2007 and 2018, Zhang and Chongyuan ignored Yeh's periodic inquiries about the status of the Vessel; (b) in October 2014, Zhang, Szutu, Wang, and Su colluded to submit a materially misleading statement from Zhang to Sotheby's; (c) from 2014 to 2016, Su and Wang, in collaboration with Wu Ji and Szutu, refused to allow Sotheby's to disclose Su and Wang's identities and contact information to Yeh, and refused to contact Yeh themselves; (d) in 2015, Su, working with Szutu and Chongyuan, failed to name Yeh as a defendant or to mention his ownership interest during the Henan Action to quiet title; and (e) in 2017, Su and Wang failed to name Yeh as a Defendant when they filed this lawsuit.[49]

---

[49]     Yeh also argued that Su and Wang engaged in additional affirmative acts of concealment, including (1) creating false customs forms in 2014; (2) tasking Szutu to "attempt" to serve court papers from this litigation on Yeh in Taiwan in the spring of 2018; and (3) that Xuejie Wong, Su and Wang's counsel, deliberately ignored an email sent by Yeh to her on November 13, 2018. The Court finds that Yeh did not meet his burden of proof with respect to those three alleged acts of concealment.

     With respect to the customs forms, Yeh argued that, in June 2014, Wang "took the [V]essel from Hong Kong to Shanghai, back to Hong Kong, to create a false origin and false customs declaration before turning it over to Sotheby's." Tr. at 11a:15-17; *see also* Outbound Permit, Def. Ex. 5. Although Wang's production of the customs form in the middle of the trial and after speaking with Szutu during a break was suspect, *see* Tr. at 120b:19–164b:18 (discussing the late production of the exhibit), *id*. at 135b:22–136b:2 (Wang's admission that she spoke with Szutu during a lunch break), and although her testimony was generally inconsistent and not credible, *see supra* note 15, the Court finds that Yeh did not meet his burden to prove that Wang intentionally had such documents created as part of the scheme to conceal the conversion. For example, Yeh did not prove that Wang used the customs form to attempt to prove to Sotheby's that Su owned the Vessel. *But see* Wang Sept. 14, 2014 Email to Sotheby's, Pl. Ex. 58 at 6 (stating that "Wang Haijuan's Departure Statement" was attached, without including any other details about the contents of that document).

     With respect to the purportedly bogus attempts to serve Yeh in 2018, the Court agrees that Su and Wang's counsel should have disclosed that the individual identified as Szeto Nang, who purportedly attempted to serve Yeh in Taiwan and who filed an affidavit with the Court, *see* Affidavit, Pl. Ex. 71 at 6–7, was actually Szutu Chin

### a. Zhang and Chongyuan Ignored Yeh's Periodic Inquiries

Yeh credibly testified that he made numerous attempts to get in touch with Chongyuan from 2007 to 2014 and with Zhang from 2007 to 2018, but that neither party responded to his outreach. *See* Tr. at 278:1-3, 278:6–279:18, 283:6-11, 284:4–285:15, 285:22–286:1, 286:11-13, 294:7-10, 296:3-5, 350:14–351:13, 374:10-14 (detailing Yeh's attempts to contact Zhang); *id.* at 282:13-16, 286:24–287:14, 293:8-16, 295:8-20, 296:3-10, 302:9-15, 311:22–312:14, 318:10-19, 320:1-6 (detailing Yeh's attempts to contact Chongyuan); *see also* Yeh Decl., Pl. Ex. 80 ¶¶ 46, 55–57 (including similar testimony).  Given Zhang and Chongyuan's active involvement in the scheme to convert and sell the Vessel and to hide their actions from Yeh, their failure to respond to Yeh is logical.  Zhang and Chongyuan's repeated decisions to ignore Yeh, for years on end, constitute multiple acts of concealment.

### b. Zhang's October 30, 2014 Statement

In an effort to prove that Su was the owner of the Vessel, Wang submitted a statement to Sotheby's, dated October 30, 2014, that was purportedly signed by Zhang.  *See* Oct. 30, 2014 Zhang Statement, Pl. Ex. 13.  The document includes information that is false: it states that,

---

Chiang, the same Szutu who played a role in almost every event relevant to this litigation.  That failure alone is insufficient to prove that Szutu's attempts to serve Yeh were bogus, but Szutu is obviously not a neutral party.  He has been heavily involved in the litigation as a partisan on behalf of Su and Wang.  In addition to his active involvement in shielding their identity from Yeh prior to the commencement of this lawsuit, *see* Part III(A)(3)(c), *infra*, Defendants and Defense counsel have kept him apprised of the trial's progress, *see* Tr. at 135b:22–136b:2 (Wang); *id*. at 731:16–732:20 (Su); *id*. at 766:3-8 (Wong).  In addition, Defense counsel, Xuejie Wong, explained that when Wang did not respond to her, she would try to make contact through Szutu.  *See* Final Pre-Trial Conf. Tr., Dkt. 253 at 3:19–4:4; *see also* Tr. at 117b:21-24.

And with respect to Yeh's November 2018 email to attorney Wong, the Court finds that while Wong may have been careless when she failed to read and act upon the email, Yeh did not prove by a preponderance of evidence that Wong deliberately ignored the email in an effort to further conceal her clients' conversion of the Vessel.

Although Yeh did not meet his burden of proof with respect to those three purported acts of concealment, because Yeh did meet his burden with respect to the acts of concealment discussed in text, Yeh has satisfied the concealment element of equitable estoppel.

according to the Shanghai Judgment, Zhang "was the owner and custodian" of the Vessel, *see id.* at 3, even though the Shanghai Judgment states that Zhang was a co-owner of the Vessel with Yeh, *see* Shanghai Judgment, Pl. Ex. 4 at 16.  Zhang also purportedly stated in the document that he had to sell the Vessel because he could not bear the debts associated with it, and Yeh would not agree to share those expenses.  *See* Oct. 30, 2014 Zhang Statement, Pl. Ex. 13 at 3.  But nowhere in the statement did Zhang explain why Yeh's failure to pay certain debts meant that Zhang had the right to sell the Vessel in derogation of Yeh's co-ownership rights.  Moreover, the document falsely states that Zhang had "informed" Yeh of the sale to Su.  *See id.*  The Court credits Yeh's testimony that he did not know about or consent to the sale to Su.  Tr. at 273:21–274:1.  But, even if Zhang had informed Yeh of the sale, as a co-owner, before Zhang could sell Yeh's interest in the Vessel, Yeh would have had to consent; merely being informed of the proposed sale would not be sufficient to constitute consent to sell his undivided interest in the Vessel.  The October 30, 2014 statement was an obvious attempt to conceal the conversion of Yeh's interest in the Vessel.  Accordingly, the submission of the statement with such obvious inaccuracies and misleading information constitutes an act of concealment.

Moreover, the statement and the way it was submitted to Sotheby's left Sotheby's with no way to contact Zhang to verify the statement's authenticity or accuracy or to obtain additional information.  The statement does not include Zhang's contact information, *see* Oct. 30, 2014 Zhang Statement, Pl. Ex. 13, and Wang, not Zhang, provided it to Sotheby's, *see* Tr. at 81b:19–82b:3.[50]  Moreover, Su testified that he and Szutu asked Zhang to prepare the statement, after reaching him through an intermediary named Master An; Master An purportedly provided

---

[50]     Further evidence that the purported Zhang statement was an act of concealment rather than a legitimate effort to clarify to Sotheby's proper ownership of the Vessel: both Wang and Su testified that they received the document from Szutu.  *See* Tr. at 81b:14-18 (Wang); *id.* at 692:13-14, 697:21-25 (Su).

Zhang's phone number to them.  *Id.* at 694:17-695:16.[51]  Despite having Zhang's phone number, Su testified that he did not provide it to Sotheby's.  *Id.* at 699:11-20.  The failure of Zhang and others to provide Sotheby's (or Yeh) with Zhang's contact information or to provide any other means to verify the information in the statement obscured the true ownership of the Vessel and its subsequent conversion and constitute additional acts of concealment.

### c.  Refusal to Share Su and Wang's Names and Contact Information with Yeh

As discussed at length in the Court's findings of fact, from 2014 to 2015, Su and Wang refused to inform Yeh, either directly or via Sotheby's, of their identities or contact information. *See*, *e.g.*, *id.* at 41b:12-15, 69b:1-15, 93b:20-24, 114b:14-19, 228:16-18, 234:17–235:5, 240:10-14; Sept. 11, 2014 Wang Email to Sotheby's, Pl. Ex. 57 at 9.  Additionally, Szutu helped facilitate Wang and Su's refusal to provide Yeh with their contact information.  Wang testified that she discussed her decision not to disclose her identity to Yeh with Szutu, *see* Tr. 95b:25–96b:4, and that she did not provide Szutu's contact information to Sotheby's, *id.* at 96b:25–97b:1.

Wu Ji received several letters from Sotheby's imploring him to have his clients liaise directly with Yeh or to give Sotheby's authorization to share their information with Yeh.  *See* Dec. 24, 2014 Letter, Pl. Ex. 35; Jan. 2, 2015 Letter, Pl. Ex. 37; Jan. 23, 2015 Letter, Pl. Ex. 38; Feb. 25, 2015 Letter, Pl. Ex. 39; July 22, 2015 Letter, Pl. Ex. 40.  Wu Ji, purportedly at the direction of his client Wang, *see* Tr. at 41b:12-15, 69b:1-15, 93b:20-24, 114b:14-19, 228:16-18, 234:17–235:5, 240:10-14, refused to disclose or to allow such information to be disclosed, *see* Aug. 31, 2015 Letter, Pl. Ex. 48 (Wu Ji stating on behalf of his clients Su and Wang that "we

---

[51]     Su testified that he has met with Zhang "countless" times.  *Id*. at 596:21–597:10.  There was no explanation why Su suddenly needed the help of an intermediary to contact Zhang.

clearly replied that our information should not be disclosed to any other third parties").[52] Without knowing that Zhang sold the Vessel to Su and without knowing who had consigned the Vessel to Sotheby's for auction, Yeh could not bring a conversion action against Su or Wang. Accordingly, Su and Wang's refusal to allow their contact information to be provided to Yeh constitutes additional affirmative acts of concealment.

### d. The 2015 Henan Action

Su's attempts to use the Henan Action to prove to Sotheby's that Su owned the Vessel, without informing the Henan court of Yeh's interest and without naming Yeh as a defendant in that litigation, *see* Stip. Facts 11, 12, Dkt. 226 at 5, constitute additional acts of concealment.  As an initial matter, there is no evidence in the record that tends to show that the Henan court was aware of the Shanghai Judgment or of Yeh's ownership claim.  *See* Tr. at 688:25–689:4 (Su's testimony that he could not be sure whether the Henan court was aware of the Shanghai litigation); Henan Judgment, Pl. Ex. 49 (includes no reference to the Shanghai litigation).  Additionally, Su and Wang failed to inform Sotheby's about the Henan Action until after judgment had been entered, which prevented Sotheby's from informing Yeh so that he could intervene in the lawsuit.  Sotheby's Decl. ¶ 16.  By filing the Henan Action, Su sought to prove his ownership of the Vessel without involving Yeh, the individual he knew was claiming an adverse ownership interest.  Put another way, Su used the Henan Action to prove his ownership to Sotheby's, while concealing Yeh's ownership interest in the Vessel from the Henan court.  Accordingly, the Court finds that Su's failure to name Yeh in the Henan Action and his failure to inform Sotheby's of the lawsuit before it concluded constitute additional affirmative acts of concealment.

---

[52]    Wu Ji also played a role in this litigation, including by signing several documents submitted as part of this lawsuit.  *See*, *e.g*., Su Decl., Dkt. 21-1 at 6; Su Decl., Dkt 46-4 at 1–2; Zhang Decl., Dkt. 46-4 at 3–4.

Both Szutu and Chongyuan were also involved in the 2015 Henan Action and in efforts to conceal from the Henan court Yeh's ownership interest and Zhang and Su's conversion of that interest. Su credibly testified that he gave Szutu power of attorney to handle the Henan court action and that Szutu submitted the 2007 sales contract between Su and Zhang to the court. Tr. at 615:17–616:1. Moreover, the Henan court stated that Chongyuan had provided it with two certificates: one issued in March 2015 that stated that a local government office had approved the 2005 auction; and one issued in June 2015 that stated that the Vessel had been delivered to Zhang for holding because the 2005-2006 auction was not successful. Henan Judgment, Pl. Ex. 49 at 7. This Court concludes that it is more likely than not that both Szutu and Chongyuan did not disclose the existence of the Shanghai Judgment or Yeh's ownership interest to the Henan court. Szutu and Chongyuan's actions with respect to the Henan court constitute additional acts of concealment by members of the scheme.

### e. Failure to Name Yeh as a Defendant in the Complaint Filed in this Case

The Court further finds that Su and Wang's decision not to name Yeh as a Defendant when they filed this action in 2017 constitutes an additional act of concealment. *See* Stip. Facts 13, 14 Dkt. 226 at 5. The Complaint does not mention Yeh. *See generally* Compl., Dkt. 1. Here, too, Su and Wang concealed their conversion of Yeh's ownership interest in the Vessel by filing a lawsuit to recover possession of the Vessel, without mentioning the fact that it was Yeh's claim to ownership that led Sotheby's to refuse to return the Vessel. Filing this lawsuit in that manner constituted yet another act of concealment by Su and Wang.

In short, Yeh has proved by a preponderance of the evidence that Su and Wang, alongside numerous others involved in the concealment scheme, engaged in affirmative acts of

concealment that prevented Yeh from filing his conversion claim on a timely basis, satisfying the first prong of an equitable estoppel argument.

### 4.  The Due Diligence Requirement

In addition to proving affirmative acts of concealment, a plaintiff seeking to equitably estop a defendant from asserting a statute of limitation defense against a claim of conversion must meet the due diligence requirement.  Specifically, the action must be brought within a reasonable time after the facts giving rise to estoppel have ceased.  *See Wei Su*, 490 F. Supp. 3d at 731 (citing *Prevost v. Hartman*, 103 A.D.2d 842, 843 (2d Dep't 1984); *Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 200 (2d Cir. 1991)).  Yeh satisfied the due diligence requirement.

As an initial matter, the Court credits Yeh's testimony that he made persistent efforts from 2007 to 2014 to contact Chongyuan and from 2007 to 2018 to contact Zhang about the Vessel and that neither responded to him.  With respect to Zhang, Yeh also testified that he tried to find third parties who knew Zhang that he could pay to help him resolve the ownership dispute.  *See* Tr. at 318:23–319:9 (describing one such effort in 2015); Agreement, Def. Ex. 8 (laying out the terms of another such effort in 2016).  In addition, once he learned that the Vessel had been consigned to Sotheby's, Yeh promptly hired counsel to stop the auction and to assert his ownership interest in the Vessel.  *See* Tr. at 560:7-10, 571:23-25, 599:14-20; *see also* Pl. Exs. 7–12, 34, 36, 41 (correspondence between Sotheby's and Yeh's counsel).  Accordingly, the Court concludes that Yeh acted diligently with respect to his conversion claim, but given the ongoing concealment, he was unable to bring his claim in a timely manner.

Su and Wang argue that Yeh did not satisfy the due diligence requirement because "a simple Google search" of the Vessel would have revealed postings on the website

www.artron.net ("Artron"), which state that the Vessel had been auctioned in both 2006 and

2011.  *See* Tr. at 473:8-22, 474:3-4; Artron Printouts, Def. Exs. 3, 4 (printout from Artron stating

that the Vessel had been auctioned in Shanghai in 2006 and 2011); *see also* Artron Printout, Def.

Ex. 9 (translation of a screenshot from Artron with additional details about the Vessel).  Yeh

testified that he was unaware that a Google search would lead to the Artron webpages.  *See* Tr. at

474:16-24.[53]  Yeh explained that he did not check Artron for information about the Vessel

because he viewed it as subpar website that often included inaccurate information.  *See id.* at

450:4–451:25 (comparing Artron to Yahoo and noting that there were better art websites

available).  The Court credits that explanation, especially because the information about the

Vessel on the Artron website is, in fact, inaccurate.  *See* Artron Printout, Def. Ex. 9 (stating

inaccurately that the Vessel had been sold in 2006 to an antique dealer from Hong Kong or

Shanghai).

Additionally, even if Yeh had been aware of the information on Artron, that would not

mean that Yeh did not act diligently.  Su and Wang did not prove when the posting first appeared

on Artron.  *See* Research, Pl. Ex. 1 at 34, 35 (implying that the screenshot was taken on

September 17, 2014); Printout Def. Ex. 3 (stating that the website was visited on June 1, 2022);

Artron Printout, Def. Ex. 4 (same).  Accordingly, the Court has no way to determine whether

Artron reported information about the 2011 auction before it took place so that Yeh could have

taken some action against Chongyuan to stop the auction and recover the Vessel.  Moreover,

---

[53]     Su and Wang argued that Yeh had seen the website because two screenshots of the website that appear to
have been taken on September 17, 2014, were included as pages 34 and 35 of Plaintiff Exhibit 1.  *See* Tr. at 475:2-4,
476:6-23, 505:16-25; Research, Pl. Ex. 1 at 34, 35.  Plaintiff Exhibit 1 is the research that Yeh conducted on the
Vessel.  *See* Tr. at 80:1-12.  When confronted with those two pages from the exhibit, Yeh testified that he had not
seen them before and that he had not provided them to his attorneys.  *See id.* at 452:14–453:14.  Yeh's counsel later
explained that the pages mistakenly had been included in the exhibit and that they had been produced by Su and
Wang to Yeh in discovery.  *Id.* at 504:31–505:15.  The Court finds that explanation credible, especially as the
screenshots look very different from the remainder of the exhibit.  Accordingly, the Court credits Yeh's testimony
that he had not seen the postings on the Artron website until the trial.

even if Yeh had known via Artron that the Vessel had been offered for sale at a Chongyuan auction in 2011, Yeh credibly testified that the auction house persistently ignored his inquiries. *See* Tr. at 282:13-16, 286:24-287:14, 293:8-16, 295:8-20, 296:3-10, 302:9-15, 311:22–312:14, 318:10-19, 320:1-6.  Additionally, Su and Wang did not provide any evidence that, had Yeh been aware of the 2011 auction, Chongyuan would have informed him that Szutu had consigned the Vessel for auction and that Su claimed to own the Vessel.  In short, Defendants did not prove that there was anything about the Artron website that would have given Yeh the information he needed to bring his conversion claim sooner.

As part of the due diligence requirement, a plaintiff "is said to bear the burden of establishing that the action has been brought within a reasonable time after the facts forming the basis for the estoppel no longer are operational," *see Golden Budha Corp.*, 931 F.2d at 200, with the outer limit being the "statute of limitations measured from the date when the facts giving rise to the estoppel have ceased to be operational," *see Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 443 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).  The Court finds that the conditions giving rise to the estoppel ceased when Yeh finally learned about this lawsuit.  Yeh testified that on November 9, 2018, a friend mailed him a local Taiwanese newspaper containing the notice that the Court had ordered Sotheby's to publish as part of the efforts to serve Yeh.  *See* Tr. at 354:13-20.  The published notice included the names of the parties and their attorneys.  *See* Newspaper Service, Pl. Ex. 77 at 15.  Once he received that notice, Yeh had sufficient information about Su and Wang's identities that he was no longer prevented from filing his conversion claim.

Yeh brought his conversion cross-claim on May 24, 2019, *see* Yeh Answer and Cross-Claims, Dkt. 104 at 7–8, six months after the conditions giving rise to the estoppel came to an

end.  Because six months is well within the three-year statute of limitations period, *Twersky*, 993

F. Supp. 2d at 443, and because that is a reasonable period for Yeh's attorneys to have

investigated and filed a claim, the Court finds that Yeh has met the due diligence requirement.[54]

In short, because Yeh has proved that affirmative acts of concealment prevented him

from bringing his conversion claim in a timely manner and that he acted with due diligence once

he learned of the claim, his conversion claim is not time-barred.  Because Su and Wang's only

defense to the conversion claim was that the statute of limitations has expired, Yeh has prevailed

on his conversion claim.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Yeh on his conversion claim, and

his claim for a declaratory judgment is dismissed.  Neither party briefed nor made arguments at

trial about appropriate remedies in the event that Yeh were to prevail on his conversion claim.

At this juncture, the Court declines to make findings of fact and conclusions of law about the

appropriate remedies, but notes the following:

- The parties agreed that New York law applies to Yeh's conversion claim, including

  remedies.  *See* Stip. of Law, Dkt. 226 at 6–7; Tr. at 885:21–886:2, 888:23–889:2, 904:9–

  23.

- Yeh has a fifty percent ownership interest in the Vessel.

---

[54]    The Court also finds that Yeh acted within a reasonable time after he saw the notice.  Yeh emailed Xuejie
Wong, Su and Wang's attorney in this litigation, on November 13, 2018, four days after he learned of this lawsuit.
*See* Email to Attorney Wong, Pl. Ex. 16 (dated Nov. 13, 2018).  When Wong did not reply to his email, Yeh, who
does not speak English, had his English-speaking niece help him write an email to Sotheby's lawyers.  *See* Tr. at
374:15–375:23; Email to Sotheby's Counsel, Pl. Ex. 18 (dated Mar. 12, 2019).  After Sotheby's forwarded Yeh a
court order scheduling a hearing to show cause why Yeh should not be held in default, Yeh flew from Taiwan to
New York and appeared at the hearing.  *See* Tr. at 380:16-24; 381:18-23, 785:25–786:8, 815:4-9.  Soon after, Yeh
hired counsel in New York and, on May 24, 2019, he filed his conversion cross-claim.  *See* Yeh Answer and Cross-
Claims, Dkt. 104 at 7–8.

- In his pleading, Yeh requested that the Court award him damages on his conversion claim; he did not request possession of the Vessel.  Yeh Answer and Cross-Claims, Dkt. 104 at 7–9.

- Under New York law, "the general rule with regard to the measure of damages in conversion is to award the value of the property at the time of conversion, together with interest." *Will of Rothko*, 56 A.D.2d 499, 503 (1st Dep't 1977) (internal citation omitted).[55]  Additionally, "if plaintiff accepts return of the property," damages may include "the loss flowing from the conversion." *Chow v. Kshel Realty Corp.*, No. 115033/02, 2011 WL 1748557, at *65 (Sup. Ct. N.Y. Cnty. Apr. 27, 2011).[56]

- Under the doctrine of collateral estoppel, the Court adopts the finding in the Shanghai Judgment that Zhang was a co-owner of the Vessel and that he had the right of possession, as of the date of that Judgment.  *See* Shanghai Judgment, Pl. Ex. 4 at 12–13, 16.

---

[55]     But "where the conversion of an item of fluctuating value is involved, then damages are measured by considering the highest market value within a reasonable time after notice of the conversion." *Will of Rothko*, 56 A.D.2d 499, 503 (1977).

[56]     Additionally, "[p]unitive damages are available for conversion where circumstances show that the conversion was accomplished with malice, insult, reckless and willful disregard for plaintiff's rights, or by other proof evidencing the aggravated nature of the act." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp.3d 193, 198 (S.D.N.Y. 2018) (cleaned up).

Notably, Yeh did not include a request for punitive damages in his initial pleading, *see* Yeh Answer and Cross-Claims, Dkt. 104 at 7–9, although he did plead that Su was aware Yeh was a co-owner of the Vessel and that Yeh did not consent to Su purchasing the Vessel, *see id.* ¶¶ 17–20.  At this juncture, the Court declines to take a position as to whether Yeh's failure to plead expressly that he is entitled to punitive damages is fatal to any future claim for such damages. *Compare Belt v. Girgis*, 82 A.D.3d 1028, 1030 (2d Dep't 2011) ("The plaintiff was not entitled to punitive damages, as she neither demanded punitive damages in her pleadings, nor made a timely application to conform the pleadings to the proof.") *with Bondi v. Bambrick*, 308 A.D.2d 330, 330–31 (1st Dep't 2003) (holding that allegations of recklessness were sufficient to put defendant on notice of a potential claim for punitive damages).

- Su conceded through counsel that he was not a bona fide purchaser when he bought the Vessel from Zhang in 2007.  *See* Tr. at 880:12-13, 880:18.

- "Under New York Law, a purchaser of personal property cannot acquire good title from a seller who stole the property."  *Gemological Inst. of Am., Inc. v. Zarian Co.*, 349 F. Supp. 2d 692, 696 (S.D.N.Y. 2004); *see also Reif v. Nagy*, 175 A.D.3d 107, 129 (1st Dep't 2019) ("In New York, a thief cannot pass good title.") (collecting cases).[57]

- Sotheby's is owed reasonable attorneys' fees and costs, although the Court has not yet decided the amount or the appropriate allocation as between Yeh and Su and Wang.  *See generally* Motion for Fees & Costs, Dkts. 122–126.

- In certain circumstances, a court may order that a property be sold and the proceeds be divided.  *See Macklowe v. Macklowe*, 176 A.D.3d 470, 471 (1st Dep't 2019); *see also Popov v. Hayashi*, No. 400545, 2002 WL 31833731, at *8 (Cal. Super. Ct. Dec. 18, 2002).[58]

With those considerations in mind, the Court encourages the parties to try to settle the issues of remedy and Sotheby's attorneys' fees and costs.[59]  By no later than **Friday, November 18, 2022**, the parties must meet and confer and file a joint report on the prospect of settling the remaining issues in this litigation, including whether the parties would like a referral for a

---

[57]     At this juncture, the Court declines to decide whether, under New York law, Zhang passed good title to Su with respect to his fifty percent ownership interest or his right to possess the Vessel.  The Court expressly asked Defense counsel to discuss that issue in its closing arguments, *see* Tr. at 825:7-15, 884:19–885:5, but Defense counsel declined to do so, *see id.* at 886:3-22, 888:18-24.  Both parties agree that this issue is to be determined under New York law.  *Id.* at 888:23–889:2, 904:9-23.

[58]     The Court takes no position as to the likelihood that the Vessel could be sold or whether Sotheby's would be willing to attempt to sell it at auction.

[59]     Because Sotheby's fees and costs remain at issue, the Court directs the parties to invite Sotheby's to participate in any settlement negotiations.

settlement conference with the assigned Magistrate Judge or to the Court-annexed mediation program.  If the parties do not wish to pursue settlement, the joint report must include a proposed schedule for supplementary briefing on the issue of remedy,[60] with Yeh to file the opening brief. Although Sotheby's is a disinterested stakeholder on liability, the parties must include whether Sotheby's plans to file a brief on remedies, given its pending motion for fees and costs and its expertise vis-à-vis the likely market for the Vessel.


**SO ORDERED.**

**Date:   October 24, 2022**
**New York, New York**                                     **VALERIE CAPRONI**
                                                        **United States District Judge**

---

[60]     Although the Court may not grant the request, either party may move to re-open expert discovery solely on the issue of remedy, including with respect to the valuation of the Vessel.  In the event that either party makes such a request, the joint letter must include proposed deadlines for expert discovery, including for the exchange of expert reports and any prospective *Daubert* motions.